**Betty KITTLES on behalf of Finess LAWTON, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 01 CV 5547(RJD).**

United States District Court, E.D. New York.

Feb. 19, 2003.

Beth G. Schwartz, Lincoln Square Legal Services, Inc., New York, NY, for the plaintiff.

Carolyn Lisa Miller, Asst. U.S. Atty., Brooklyn, NY, for the defendant.

### *MEMORANDUM & ORDER*

DEARIE, District Judge.

Plaintiff Betty Kittles appeals the denial of Supplemental Security Income ("SSI") for her minor daughter, Finess Lawton. In the alternative, plaintiff requests a remand of the case for further administrative proceedings. Both parties move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons that follow, this case is remanded to the Commissioner for consideration under the Final Rules.

### *BACKGROUND*

*A. Procedural History*

Finess Lawton was born on August 8, 1993. She is currently nine years old. Plaintiff Betty Kittles first applied for SSI benefits for Finess in March 1995, when Finess was 19 months old. Tr. 101–6. This application was denied, and plaintiff did not file for reconsideration. Tr. 78. Plaintiff re-applied in May 1998, when Fi-

ness was four years old. Tr. 122. In this application, plaintiff reported that Finess suffered from a learning disability and a speech impairment, and that she was prone to violence, hyperactivity and temper tantrums. *Id.* Finess had been receiving speech and occupational therapy since September 1995. Tr. 139. This second application was also denied in September 1998 and again on reconsideration in April 1999. Tr. 81–84, 87–90.

Plaintiff petitioned for a hearing, which took place on May 2, 2000. Tr. 50–74. ALJ Seymour Fier ruled on June 9, 2000 that Finess was not disabled and thus ineligible for SSI. Tr. 24–32. The ALJ's decision became final when plaintiff's request for review to the Appeals Council was denied on July 15, 2001. Tr. 5–7. This action followed.

*B.  Treatment and Educational Background*

In May and June of 1995, when Finess was nearly two years old, she was evaluated by doctors at New York Hospital for participation in the Early Intervention Program.[1] Tr. 177–86. Finding developmental delays in Finess' personal, social, fine motor, gross motor and language skills, Dr. Evelyn Lipper recommended placement in a "special education preschool program which includes speech, physical, occupational therapy and special education." Tr. 179. Finess was subsequently referred to the Apple School, "a preschool program for learning and enrichment" of United Cerebral Palsy of Queens, which she attended from September 1995 until June 1998. Tr. 66, 219, 215. She then attended a special education class for kindergarten, first and second grade at the La Guardia Family College school, continuing to receive regular speech/language and occupational therapy. Tr. 53, 66.

*Evidence from Teacher Evaluations*

At the Apple School, Finess was classified as a "preschool student with a disability." Tr. 241. On May 8, 1996, she was evaluated by Dr. Carol Mirochin. Tr. 270–71. Putting Finess through a series of tests including the Bayley Scales of Infant Development and the Vineland Adaptive Behavior Scales, Dr. Mirochin found that at 33 months, Finess displayed mental development equivalent to a child of 25 months and cognitive and language ability of between 19 and 21 months. Tr. 270–71. Dr. Mirochin noted that while Finess appeared friendly and alert, she also "tended to speak in a soft voice" and "was at times inarticulate and unintelligible." Tr. 271. At other times, however, commands that Finess directed at her such as "Get that ball" were "loud and clear." *Id.* While Finess was "cooperative" with the testing, "she seemed to have some difficulty understanding what was expected of her." *Id.*

Clinical observations from a February 13, 1998 report present a similarly mixed picture. On the one hand, the report indicates that "Finess coordinates numerous form-content-usage interactions" such as "I like to eat in the restaurant like this." Tr. 234. The report continues to observe that:

> There are, however, deficits in syntax and morphology, for examples [sic]: there is omission of the capula, there is

1.  "The New York State Early Intervention Program is a family centered program that provides a wide variety of services to eligible infants and toddlers with special needs and their families.... Any child from birth to three years of age who has a developmental delay, or has a physical or mental condition with a high probability of resulting in a developmental delay, is eligible to receive EI services." If a child is found to be eligible, the services are provided at no cost to the family. Available at *<http://www.advocatesforchildren.org/pubs/ei.html>*, visited on January 21, 2003.

no use of auxiliary verbs (can, will, be), and no use of wh-clauses. There is also some echolalia [2] as well as perseveration. In addition, there is difficulty with topic maintenance. Expressive vocabulary remains deficient. Tr. 234.

Moreover, the Expressive One–Word Picture Vocabulary Test indicated a language age of two years and seven months, at a time when Finess was four years and eight months old. *Id.*

Speech pathologist Linda Salata made similar findings when evaluating Finess on March 3, 1998. Tr. 224–25. While she found that Finess had exhibited growth in receptive and expressive vocabulary, Finess' expressive vocabulary was "still significantly below the norms." Tr. 225.

On March 25, 1998, occupational therapist Adrienne Shapiro issued a progress report on Finess. Tr. 222–23. She indicated that Finess was "verbal and engages easily with toys." Tr. 222. However, Shapiro remarked that Finess was also "easily distracted and needs verbal prompts to resume the task at hand." *Id.* She also commented that Finess "continues to display sensory processing difficulties in the area of tactile and vestibular awareness." *Id.* Finess had "difficulty manipulating a child's scissors and was unable to cut out any shapes or cut on a 6' line." *Id.* Shapiro opined that Finess' graphomotor skills were delayed, as she could not copy a cross and a square and her assembly of block designs was "poor." *Id.* Furthermore, Finess appeared "mildly defensive to light touch" and "does not tolerate someone too close behind her." *Id.*

On March 23, 1998, Finess' preschool teacher, Lisa Rossdale, conducted a teacher evaluation / classroom observation of Finess. Tr. 219–21. Rossdale observed that with respect to motor development, Finess was ambulatory and able to ride on an "adapted tricycle with straps on her feet which are secured to the pedals." Tr. 219. Finess could color inside the lines of a coloring book and could cut with a scissor, but could not "maintain her attention long enough to cut on lines." *Id.* Finess' visual attention span would "fade[ ] in and out." *Id.* Rossdale noted that eyeglasses had been prescribed for Finess. *Id.*

Regarding activities of daily living, Rossdale observed that although Finess could feed herself independently, she would often need to be reminded that she was eating. *Id.* Finess was toilet trained and could dress and undress herself when going to the bathroom. However, sometimes, Finess would "stand motionless in the room until she is told, several times, to take off her coat and hat." *Id.*

With respect to Finess' language development, Rossdale remarked that Finess seemed to "'tune in' and 'tune out' frequently during the day." Tr. 220. When she was verbally refocused, however, she would "immediately join[ ] in with the group lesson or activity, answer[ ] questions and sing[ ] songs." *Id.* When "really focusing on others," Finess could maintain simple conversations with others. At other times, though, Finess would remain mute, exhibit echolalic language, and engage in "very strange dialogues." *Id.*

Rossdale observed that Finess could work on puzzles, string beads and stack nesting cups. *Id.* She could label 21 letters of the alphabet and recognize her written name and count by rote from 1 to 10. However, Finess "is having problems

---

**2.** "Echolalia" is defined as "the often pathological repetition of what is said by other people as if echoing them." Merriam Webster Medical Dictionary, available at *www.intelihealth.com/IH/ihtIH/WSIHW000/9276/9276.html,* visited on November 27, 2002.

with sequencing skills" and her comprehension skills "need improvement." *Id.* Finally, Rossdale noted that Finess was becoming more socially involved with her classmates, but that her behavior was still "somewhat compulsive, overbearing and unusual." Tr. 221.

Rossdale conducted a second observation of Finess on April 27, 1998, presenting a mixed report much like her first. Tr. 231–33. While she stated that "Finess is an outgoing little girl with a good sense of humor," Rossdale also noted that Finess was "extremely possessive" of her one best friend to the point of requiring intervention. Tr. 231. Rossdale remarked that Finess "speaks up for herself," although mentioned that "[s]he sometimes needs to be reminded that she must tell us what is upsetting her, rather than crying." Tr. 232.

In May 1998, her teachers determined that Finess' current educational services-speech and occupational therapy-should be continued. Tr. 226–30. In June 1998, Finess graduated from the Apple School. Tr. 255.

On July 17, 1998, Kathy Toal, a supervising teacher at Apple, filled out a New York State Division of Disability Determination form that was submitted as part of Finess' June 1998 SSI application. Tr. 255–59. On the form, Ms. Toal indicated that Finess did not exhibit "poor frustration tolerance behaviors such as fighting, tantrums, crying episodes, etc.," peer relating or discipline problems, or any problems completing tasks in a timely manner or age inappropriate behavior. Tr. 255–57. Regarding Finess' speech problems, Ms. Toal referred to attached "Educational and Speech reports," which it appears from the record are the reports written by Finess' teachers and therapists cited above. Tr. 258.

In the fall of 1998, Finess began attending kindergarten at the La Guardia Family College. Tr. 286. The school classified Finess as "Speech Impaired," placed her in a class of 10 students and prescribed ongoing speech and occupational therapy. Tr. 261–64. On January 27, 1999, Finess' kindergarten teacher Shannon Kiley filled out the same Division of Disability Determination form that Kathy Toal submitted as part of Finess' SSI application. Tr. 286–90. Ms. Kiley made the same observations as Ms. Toal regarding Finess' appropriate social interaction and frustration tolerance behaviors. Tr. 287–88. However, Ms. Kiley noted that Finess did have problems in the effective completion of tasks in a timely manner. Tr. 288. Moreover, Ms. Kiley remarked that "Finess' expressive language is mildly delayed. She has difficulty with word finding for labeling and expressing her needs." Tr. 289. While Ms. Kiley found that Finess' "articulation is clear and is able to be understood when her volume is increased," she also relayed that "[w]hen speaking Finess uses a very low volume and needs to be reminded to speak louder." *Id.* Additionally, she stated that, "Finess exhibits difficulty answering abstract questions and following multi-step directions. She rarely initiates spontaneous speech or a conversation with adults and some peers." *Id.*

On March 14, 2000, Finess' first grade teacher, Kristen Swanson, filled out an "Educational/Psychological Report" for Finess' SSI application. Tr. 294–97. Ms. Swanson indicated that Finess did not exhibit perceptual or thinking disturbances, problems with impulse control, trouble interacting appropriately with peers or teachers, or a generally pervasive mood of unhappiness or depression. *Id.* She did note, however, that "[o]ccasionally Finess isolates herself from her peers. When asked for an explanation of her actions, she has difficulty verbalizing it." Tr. 295.

Additionally, she reported that Finess had problems with the timely completion of tasks, stating that "Finess gets twice the amount of time to take tests. She often needs extra time to complete her work (journal writing, projects, reading activities, etc.)." *Id.* Moreover, Swanson observed that Finess had problems with concentrating and remaining focused, sometimes falling asleep in class and having difficulty answering questions related to the activity she was engaged in. *Id.* Swanson also pointed out that Finess exhibited emotional lability,[3] crying when there was a lot of noise in the classroom. *Id.*

Regarding Finess' academics, Swanson stated that Finess was not reading and writing at a age-appropriate level, but was instead reading and writing at a kindergarten level and performing math at "lower-level 1st grade." Tr. 296. Finess' speech and language function displayed "a mild-moderate receptive language delay and a moderate expressive delay." Tr. 296. As she stated, "Finess has great difficulty with processing and word retrieval." *Id.* Finess' vocal quality, pitch and fluency were all adequate and intelligible, although her volume would sometimes decrease depending on the social situation and her fluency would be shortened due to difficulties with context and word retrieval. Tr. 296–97. Furthermore, in situations where Finess felt comfortable, such as with familiar teachers or peers, she could communicate effectively. Tr. 297. However in settings of increased pressure, Swanson remarked that Finess "often withdraws and does not communicate at all." *Id.*

*Medical Evidence From Treating Sources*

Finess was first seen by Dr. Margaret Levitt of New York Hospital's Women's and Children's Health Center on December 9, 1993, and for nine successive visits until March 3, 1995. Tr. 165. In a report submitted to the NYS Office of Disability Determinations on July 11, 1995, Dr. Levitt reported that she had diagnosed Finess with developmental delays and behavioral problems. *Id.* Regarding Finess' symptoms as a nearly two year old child, Dr. Levitt reported that Finess could not feed herself with a fork or spoon, did not follow directions, had delayed fine and gross motor skills, and reportedly had frequent temper tantrums. *Id.* Dr. Levitt conveyed that Ms. Kittles had observed Finess engaging in self-destructive behavior such as beating herself and head banging. Tr. 166. She noted that Finess had a short attention span, an inability to understand, engage or respond, and impaired motor skills. Tr. 167.

Finess saw Dr. Rose Vay Luong, her pediatrician, in July 1997 and again in July 1998. Tr. 213. Dr. Luong's report of July 30, 1998 stated that while Finess had a history of speech delay, Finess' pronunciation seemed improved. Tr. 213. She seemed to know the alphabet and spoke in full sentences. Tr. 215. Finess' fine and gross motor skills were age-appropriate and she was able to dress herself. *Id.* Dr. Luong also indicated that Finess displayed age-appropriate cognitive and social/emotional skills. Tr. 216.

*Consultative Physician Opinions*

On July 31, 1998, Finess was sent to see SSA consultative examiner, Dr. Morton Rosen, for a psychological exam. Tr. 217–18. Dr. Rosen administered the Raven

---

**3.** Emotional lability is defined as "easily moved or changed, quickly shifting from one emotion to another." Available at *<http://www.webref.org/psychology/l/labile.htm>*, visited on January 21, 2003.

Progressive Matrices, a non-verbal test. *Id.* Finess was able to understand the directions and follow through on the first five out of the six elementary questions. Tr. 217. However, as the complexity increased, she began to lose her attention, making trial and error responses and selecting the same response for all of the presented items. Based on Finess' performance, Dr. Rosen diagnosed Finess with "mild mental retardation" and an IQ of 65. Tr. 218.

Dr. J. Pauporte, a State agency physician, reviewed Finess' medical record on September 21, 1998. Tr. 277–80. He found that Finess' learning disability and speech problems were severe impairments; however, they did not meet or medically or functionally equal the severity of a listed impairment under the Social Security regulations. *Id.* Applying the broad areas of functioning test (described more fully below), Dr. Pauporte concluded that Finess had a marked impairment in her "cognitive/communicative" function, and less than marked impairments in the "personal functioning" and "concentration, persistence and pace" arenas. Tr. 279. He found no evidence of limitation in the areas of motor or social functioning. *Id.*

A second State agency physician, Dr. M. Malik, reviewed the medical evidence on April 28, 1999. Tr. 281–84. He also concluded that Finess' impairments were severe, but did not meet, medically or functionally equal a listed impairment. Tr. 281. Like Dr. Pauporte, in evaluating Finess' broad areas of functioning, he found that she had a marked limitation in the cognitive/communicative arena. However, he differed slightly from Dr. Pauporte in the other arenas, finding that Finess had less than marked limitations in the "social" and "concentration, persistence or pace" arenas, and no limitation in the motor and personal functioning arenas. Tr. 283.

*Hearing Testimony*

At the hearing held on May 2, 2000, the ALJ questioned both Ms. Kittles and Finess briefly. Tr. 52–74. Ms. Kittles, who herself has a learning disability (Tr. 180, 185, 308), reported that Finess is a slow learner, has problems pronouncing words and sometimes does not speak. Tr. 54–55, 68. She testified that Finess is in a special education first grade and receives speech and occupational therapy. Tr. 53–54. When asked by the ALJ about Finess' tendency to fall asleep in class, Ms. Kittles stated that it might have to do with Finess staying up late. Tr. 62–63. She further reported that Finess is easily distracted and will throw tantrums sometimes because she does not want to do her homework. Tr. 67. She also testified that Finess does not have any friends at home, and that Finess does not want to play with kids at the park because she is "scared to make friends." Tr. 68. While she stated that Finess will play with her cousins, Ms. Kittles also divulged that Finess is afraid that the children in school do not like her. Tr. 69–70.

The ALJ also questioned Finess, who had to be asked by the ALJ to "speak a little louder." Tr. 57–60. Finess was able to give short, one or two word answers to questions such as "What is your name?" and "Can you speak?" Tr. 57–58. To numerous questions, however, the record reflects that Finess made no audible answer. *Id.* When asked what makes her cry in school, Finess responded, "When kids make a lot of noise." Tr. 72. Furthermore, when asked why she has trouble with her homework, she stated, "I fall asleep." Tr. 73.

*The ALJ's Decision*

Following the hearing on May 2, 2000, the ALJ issued his decision on June 9, 2000. Tr. 24–32. Following the three-step process laid out by the regulations,

the ALJ assessed Finess' impairments, first to see whether she had engaged in substantial gainful activity and next to see whether she had a medically determinable "severe impairment." Tr. 26. Finding that Finess was not gainfully employed and that she did have a severe impairment as defined by the Act, the ALJ moved on to the third and most complex step in the analysis-determining whether Finess' impairments met or were medically equivalent in severity to the criteria for a particular impairment in the regulatory "Listing of Impairments." Tr. 26. After reviewing the record, the ALJ determined that Finess' impairments did not meet or medically equal any of the listed impairments. Tr. 27. Specifically, the ALJ ruled out Organic Mental Disorder, Mood Disorder, Mental Retardation, and Attention Deficit Hyperactivity Disorder, stating that Finess' impairments are "not so severe as to qualify under any of those Listings." *Id.*

Next, the ALJ made the requisite inquiry into whether Finess' impairments could nevertheless be found "functionally equivalent" to one of the Listed impairments. Tr. 27–28. Employing the "broad areas of development" analysis laid out by the Interim Rules (described below), the ALJ evaluated Finess in five areas of development: cognitive/communicative, motor, social, personal and concentration, persistence and pace. Tr. 28–31.

The ALJ described the cognitive/communicative arena as involving

the child's ability to learn, understand and solve problems through intuition, perception, verbal and non-verbal reasoning, and the application of acquired knowledge; the ability or inability to retain and recall information; ability or inability to communicate by expressing needs, feelings and preferences; and by engaging in conversation in a spontaneous, interactive and increasingly intelligible manner. Tr. 28–29.

The ALJ found that Finess displayed "less than marked[ ]" limitations, reasoning that although earlier school records reported that Finess had expressive and receptive language difficulties, "[c]urrent school records, dated March 14, 2000 indicate that Finess does communicate effectively with teachers and peers she is familiar with." Tr. 29. He also noted that her current teacher called Finess' speech fluent, albeit shortened, and that she characterized the expressive language delays as "mild to moderate." *Id.* Moreover, the ALJ opined that "[i]t is clear from the record that Finess has benefitted from participation in speech and language therapy." *Id.* Hence, the ALJ found Finess less than markedly limited in this arena.

Regarding motor and social development, the ALJ also found Finess to be less than markedly limited. Tr. 29–30. Social development is described by the ALJ as relating to "the child's ability to initiate age-appropriate social exchanges and to respond to the social environment through appropriate and increasingly complex interpersonal behaviors, such as showing affecting [sic], sharing, cooperating, helping and relating to other children as individuals or as a group." Tr. 30. The ALJ reasoned that while teachers such as Lisa Rossdale had described Finess' behavior as "somewhat compulsive, overbearing and unusual, and that she tends to push and shove other children for no reason, other school records dated May 1998 indicate that 'Finess is an outgoing little girl with a good sense of humor and has become more socially related to her peers, having one best friend in the class.'" *Id.* While noting that school records reported that Finess occasionally isolates herself from peers, the ALJ made much of the fact that the records also indicated that Finess does not have trouble interacting appropriately

with teachers and peers. *Id.* The combination of these factors, he concluded, led to a finding of less than marked limitation.

Regarding Finess' personal development, the ALJ found no limitations. Tr. 30. Finally, with respect to her concentration, persistence and pace, the ALJ found that Finess was "less than markedly" limited. Tr. 30. After explaining that this category involves "an evaluation of the child's ability to engage in an activity-such as dressing or playing-and to sustain the activity for a period of time and at a pace appropriate to the child's age," the ALJ concluded that all of the relevant evidence for this category-that Finess sometimes falls asleep in class, that her teacher provides her twice the amount of time to take tests, that she often needs to be refocused when working in group situations-still did not present an impairment that rose to the level of a marked limitation. Tr. 30-31.

The applicable federal regulations provide that unless a claimant's impairments have caused an extreme limitation in one of the above domains or a marked limitation in two of the domains, a claimant will not be adjudged to be disabled. 20 C.F.R. § 416.926a(a) and (d). Accordingly, because the ALJ did not find Finess to be even markedly limited in one domain, she did not meet the requirements for disability under the Social Security Act. The ALJ therefore denied her application for benefits. Tr. 31.

*The Appeals Council Decision*

Following the ALJ's decision on June 9, 2000, plaintiff petitioned for a review of the decision by the Social Security Administration's Appeals Council. In support of this appeal, plaintiff's representatives sent additional evidence to the Appeals Council consisting of medical records from New York Presbyterian Hospital from July 1996 to February 2000 as well as the report of a psychologist Daniela Montalto,

who evaluated Finess on August 4 and 17, 2000. Tr. 298-307. The newly-submitted medical records of February 10, 2000 included documentation by Dr. Luong, Finess' pediatrician, that Finess wet herself almost everyday upon getting off of the school bus. Tr. 300. Additionally, the reports noted that Finess attended weekly speech and occupational therapy sessions, that Finess' speech was delayed but improving, and that Finess was shy and answered questions in short sentences. *Id.*

Ms. Montalto's report offered yet another assessment of Finess' learning disabilities. Tr. 308-10. Montalto found Finess pleasant in her demeanor, but exhibiting delays in her response time and in answering questions. Tr. 308. Additionally, Finess "appeared to struggle with initiating and elaborating upon the conversation" and had "difficulty focusing on the task at hand," often providing answers that were unrelated to the questions or tasks presented. *Id.*

The WISC III intelligence tests administered to Finess by Ms. Montalto indicated a Verbal Intelligence Quotient of 73 and a Performance Intelligence Quotient of 71, both in the borderline range of functioning. Tr. 309-10. However, Finess' visual-motor integration test result was 89, higher than 23 percent of her same aged peers and "higher than what would be expected according to the scores Finess achieved on the performance scales of the WISC III." Tr. 310. Finess' verbal learning and memory was "suspected to be poor," however Ms. Montalto stated that a more sensitive test was needed to achieve reliable results. Tr. 310. Finally, Finess scored in the clinically significant range in a test measuring maturity level and childish behaviors (including fears, level of shyness, restlessness, disorganization and hyperactive immaturity), in the moderately atypical range in the area of obsessive compulsiveness,

and in the borderline range regarding anti-social behavior. However, she scored within the normal range in areas involving learning. Tr. 310. All of these findings were qualified, however, because Ms. Montalto noted that at both sessions, Finess was not wearing her glasses, which might have affected her performance. Tr. 308.

On June 15, 2001, the Appeals Council denied plaintiff's request for review in a 2-page letter to plaintiff. As the Appeals Officer wrote, even after considering all of the newly-submitted evidence and the arguments made in plaintiff's letters, the Appeals Council concluded that "there is no basis under the above regulations for granting your request for review." Tr. 5. As the letter described, "The regulations...provide that where new and material evidence is submitted with the request for review, the entire record will be evaluated and review will be granted where the Appeals Council finds that the Administrative Law Judge's actions, findings, or conclusion is contrary to the weight of evidence currently of record." *Id.* However, in this case, the Appeals Council found no basis for overturning the ALJ's decision. Moreover, as the letter stated, "In reaching this conclusion, the Appeals Council has considered the applicable statutes, regulations, and rulings in effect as of the date of this action." *Id.*

## DISCUSSION

### A. Standard for Determining Disability from Children

#### 1. Scope of Judicial Review

A final determination by the Commissioner must be examined by a reviewing court on two levels. First, the Court must determine whether the Commissioner applied the correct legal standard in assessing a claimant's application. If it finds that the appropriate law has been applied, the Court turns to the question of whether the ALJ's decision was supported by "substantial evidence." *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999). Substantial evidence must be " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Rosa,* 168 F.3d at 77 (quoting *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996)). If the Court finds that the Commissioner has satisfied both levels, it may not second guess the Commissioner's decision, " 'even if it might justifiably have reached a different result upon a *de novo* review.' " *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984)).

#### 2. Requirements for Eligibility

SSI is a federal program which provides benefits to needy aged, blind or disabled individuals who meet its statutory requirements. 42 U.S.C. § 1381. SSI offers benefits to needy disabled children under the rationale that families often have additional personal and medical expenses associated with raising a severely disabled child.[4]

To qualify for disability benefits, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382(a)(3)(C)(I). This statutory dictate translates into a 3-step analysis undertaken by the ALJ. 20

---

4. Richard P. Weishaupt and Robert E. Rains, *"Sullivan v. Zebley:* New Disability Standards for Indigent Children to Obtain Government Benefits," 35 St. Louis U.L.J. 539 (Spring 1991).

C.F.R. § 416.924(a). First, the ALJ looks to see whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). If so, the child is ineligible for benefits. Next, the ALJ assesses whether the child has a severe impairment, which is defined as an impairment that causes more than a minimal functional limitation. 20 C.F.R. § 416.924(c). Third, if the ALJ finds a severe impairment, he then must consider whether the impairment meets or is medically or functionally equal to a disability listed in the regulatory "Listing of Impairments." 20 C.F.R. § 416.924(c); 20 C.F.R. Pt. 404, Subpt. P, App. 1 ( the "Listing").

### a. Functional Equivalence under the Interim Rules

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the "Act") created a new set of standards for assessing childhood disability and specifically, for determining whether a child's impairment was "functionally equivalent" to a listed disability. The Social Security Administration first implemented these standards on February 11, 1997, when it published the Interim Final Rules ("Interim Rules"). Under the Interim Rules, if a child's impairment or combination of impairments did not match a listed impairment, the ALJ was to consider all of the child's "functional limitations"-namely, what the child could not do because of his or her impairment-to determine whether the impairment was functionally equivalent to a listed impairment. 20 C.F.R. § 416.926(a) (1997). Such assessments could take place in four different ways, looking to see whether the functional limitations manifested themselves as: (1) an

"extreme limitation of one specific function such as walking or talking"; (2) marked or severe limitations in broad areas of development such as cognition/communication, social functioning, or motor functioning; (3) episodic, chronic illnesses or attacks; or (4) marked or severe effects from medications. *Id.*

Under the second (and the most frequently utilized)[5] method, an ALJ was to evaluate the effects of the child's impairments in five broad areas of development or functioning: (1) cognitive/communicative development, (2) motor development, (3) social development, (4) personal development, and (5) concentration, persistence, or pace. 20 C.F.R. § 416.926a(c)(5)(iii) (1998). A finding of extreme or severe limitation in one area or a marked limitation[6] in two areas resulted in a determination of functional equivalence and thus, eligibility for benefits. 20 C.F.R. § 416.926a(b)(2).

### b. Amended Rules for Determining Functional Equivalence

Responding to numerous public criticisms of the Interim Rules, the Social Security Administration published amended Final Rules for childhood disability determination ("Final Rules") on September 11, 2000. Supplemental Security Income; Determining Disability for a Child Under Age 18, 65 Fed.Reg. 54747 (Sept. 11, 2000) (to be codified at 20 C.F.R. §§ 404, 416 (2001)). The Final Rules, which went into effect on January 2, 2001, are materially different from the Interim Rules on several fronts, reflecting the SSA's desire to simply and clarify the rules for both adjudicators and the public. 65 Fed.Reg. at 54,755–6. To begin, three out of the four

---

**5.** 65 Fed.Reg. 54747, 54755 (2000).

**6.** The Interim Rules defined a "marked limitation" as a limitation that was more than moderate but less than extreme, or a test

score that was at least two standard deviations below the norm. 20 C.F.R. §§ 416.926a(c)(3)(i)(A) and (C).

methods for evaluating functional equivalence have been eliminated, leaving only the second method of evaluating a child's functional limitations in broad areas of functioning. 65 Fed.Reg. at 54755. Next, the SSA has "delinked" the assessment of functional equivalence from the Listings, removing the requirement that an ALJ refer to specific listings when evaluating a child's functional impairments and permitting a finding of functional equivalence on the basis of self-contained criteria listed in the rules. *Id.* Additionally, the SSA offers more guidance as to how to evaluate the cumulative effect of multiple impairments, clarification on the appropriate use of test results, a new procedure for resolving material inconsistencies between a child's test scores and the other information in the case record, and a clarification that assessment of a child's impairments should consider not only what the child "cannot do" but also what a child "[has] difficulty doing, need[s] help doing, or [is] restricted from doing" because of her impairment. 65 Fed.Reg. at 54755–58.

Most notably, however, while the SSA continues to require a finding of one severe limitation or two marked limitations to establish functional equivalence, instead of requiring an assessment of the child's impairments in "five broad areas of functioning," the Final Rules require an evaluation of the child's impairments in "six domains." 20 C.F.R. § 416.926a(a) (2001). These six domains are: (1) the child's ability to acquire and use information, (2) to attend and complete tasks, (3) to interact and relate with others, (4) to move about and manipulate objects, (5) to care for oneself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

This shift represents both superficial and substantive changes. On the one hand, the name change from "broad areas of functioning" to "domains" and for each

of the domains themselves is arguably cosmetic, since the SSA simply wanted to make clear that the domains for determining functional equivalence are not the same as the domains in the childhood mental disorders listings, which had unfortunately shared the same headings under the Interim Rules. 65 Fed.Reg. at 54755. However, the name change also reflects some substantive differences. First, a new category was created-the domain, "Health and physical well-being," incorporating aspects of the prior methods of determining functional equivalence through "episodic impairments" and "limitations related to treatment or medication effects." 65 Fed. Reg. at 54759.

Second, and more pertinent to our case, elements from the former "cognition/communication" category are now split between two domains: "acquiring and using information" and "interacting and relating." As the report accompanying the Final Rules explains:

> In response to public comments... these Final Rules recognize that "communication" comprises speech and language, and that language is used both for learning and for interacting and relating. Therefore, we address the three components of communication (speech, language used for learning, and language used for interacting and relating) in the domains that are appropriate to the function.

65 Fed.Reg. at 54759.

Hence, a child's problems with speech and language now need to be assessed in both the "acquiring and using information" domain as well as the "interacting and relating with others" domain, rather than simply in the "cognition/communication" area of functioning. In this case, as is apparent, this change may be significant.

The Final Rules also feature needed clarification of the criteria within each of

the domains. The domain, "Attending and completing tasks," for example, a successor to the former area, "Concentration, Persistence, or Pace," includes a new definition of "attention" as "level of alertness, concentration, and the initiating, sustaining, and changing of focus needed to perform tasks." 65 Fed.Reg. at 54759. The Final Rules also further detail "the role of attention in physical and mental effort, in allaying impulsive thinking and acting, and in performing tasks at an appropriate pace, within appropriate timeframes." *Id.* In the "Interacting and relating with others" domain, the Final Rules include new explanations of how "interacting and relating entail responding to a variety of emotional and behavioral cues, speaking intelligibly, following social rules for conversation and interaction, and responding appropriately to others." *Id.*

Overall, the SSA explains, the domains are meant to make adjudicating childhood disability an easier task for ALJs. As the report states,

> We believe that the revised domains will be easier for our adjudicators to apply and for the public to understand. We believe that the new approach, together with the changes in final §§ 416.924a, provides a clearer, more comprehensive way to assess the effects of a child's impairment or combination of impairments on his or her functioning.
>
> 65 Fed.Reg. at 54756.

#### c. *Application of the Interim Rules versus the Final Rules*

The preamble to the Final Rules also contains explicit instructions on when the Final Rules are to go into effect. As it states, "These Final Rules will be effective on January 2, 2001." 65 Fed.Reg. at 54750. The Final Rules are to be applied not only to new applications after that date, but also to "the entire period at issue for claims that are pending at any stage of our administrative review process, including claims that are pending administrative review after remand from a Federal court." *Id.* Thus, even if an ALJ had ruled under the Interim Rules, any further administrative review (e.g., review by the Appeals Council) that took place after January 2, 2001, would be governed by the Final Rules.

The preamble draws a distinction, however, for final decisions by the Commissioner that are being reviewed by Federal courts. As it states, "[W]e expect that the court's review of the Commissioner's final decision would be made in accordance with the rules in effect at the time of the final decision." *Id.* Namely, if a Commissioner's decision was made under the Interim Rules, a reviewing Federal court would be constrained to evaluate the decision under the Interim Rule regime, even if the review were taking place after January 2, 2001. However, the preamble also made clear that if after January 2, 2001, the reviewing court found that the Commissioner's decision was not supported by substantial evidence under the Interim Rules, on remand, the Commissioner would apply the *Final Rules* to the entire period at issue in the claim. *Id.*

#### B. *Application*

Plaintiff moves for a reversal or remand on four separate grounds: 1) that the ALJ did not grant a full and fair hearing, 2) that the ALJ did not adequately develop the record, 3) that the Appeals Council erred in failing to address the new evidence submitted by the plaintiff, and 4) that the Appeals Council erred in failing to consider the new evidence in light of the amended Final Rules on functional limitations. We consider the last ground first, and because we find a need to remand on

this basis, we do not reach the remaining three grounds.

### 1.Whether the Appeals Council Erred in Failing to Address New Evidence in Light of the Amended Regulations

Under the law articulated above, the Appeals Council was bound to apply the *Final Rules* in assessing plaintiff's request for review. Although the ALJ's decision on June 9, 2000 was rendered under the Interim Rule regime, the Appeals Council decision on June 15, 2001 was made after January 2, 2001, the effective date of the Final Rules. Hence the Final Rules, utilizing the six domains instead of the five broad areas of functioning, ought to have been the metric by which the Appeals Council assessed the sufficiency of the ALJ's decision.

It is not clear, however, from the Appeals Council's letter whether it in fact applied the Final Rules. Although the letter states in passing that "in reaching this conclusion, the Appeals Council has considered the applicable statutes, regulations, and rulings in effect as of the date of this action" (Tr. 5), nothing else in the letter suggests that an assessment of Finess' case in light of the new regulations took place. The letter makes no mention of the change in rules governing disability determinations, of the shift from the five broad areas of functioning to the six domains, or of any difference in the ultimate outcome this regime change might make.

The Commissioner argues in its brief that it is immaterial which rules the Appeals Council applied because "the basic standard for determining functional equivalence remains unchanged from the Interim Final Rules: a child must have a medically determinable impairment or combination thereof that results in marked limitations in two domains or an extreme limitation in one domain." Reply Brief at 6. This Court disagrees-the difference between the Interim Rules and the Final Rules *is* material. Indeed, the Final Rules make several regulatory changes that might have brought about a finding of disability for Finess had they been applied.

First, the bulk of Finess' impairments involve her communicative function-indeed, her main impairments are in the speech and language arena for which she has received years of therapy. This is the very arena, however, that was revised so that speech and language would be considered in two domains-"acquiring and using information" and "interacting and relating with others"-rather than merely in one area as under the Interim Rules. Moreover, contrary to the ALJ's finding of a "less than marked" limitation, Finess' cognitive / communicative function was the one arena in which both SSA consultative examiners found a "marked" limitation. Tr. 279, 283. Therefore, had her case been assessed under the Final Rules rather than the Interim Rules, the Appeals Council may-and perhaps should-have found Finess to have a marked limitation in both the "acquiring and using information" and the "interacting and relating with others" domains, thus qualifying her for benefits.

Other changes in the Final Rules may have made a difference for Finess. To begin, the Final Rules include new instructions on how an ALJ should resolve material inconsistencies between a child's test scores and the other information in the case record. The new rules explain that while an ALJ could resolve the inconsistency by looking at other information in the case record, questioning other individuals who could provide additional information about a child's day-to-day functioning, or ordering a consultative exam, "the interpretation of a test is primarily the responsibility of the professional who administered the test." 65 Fed.Reg. at 54758.

As the regulations suggest, "If necessary, [the ALJ] may recontact the individual who administered the test for further clarification."

The ALJ discounted the test results of the SSA consultative examiner, Dr. Rosen, who found Finess to have mild mental retardation and an IQ of 65, well within the marked range (Tr. 218, 27).[7] The ALJ rejected Dr. Rosen's conclusion as being "based upon non-verbal testing" and criticized Dr. Rosen for "not provid[ing] specific sub-test result scores." Tr. 27. The ALJ stated that Dr. Rosen's test results were inconsistent with Finess' school records indicating that she had only mild speech delays and the absence in the record of any other evidence suggesting that Finess was mentally retarded.

The Final Rules, however, call for deference to Dr. Rosen in the interpretation of the test results and invite further questioning of other individuals regarding Finess' day-to-day functioning, or recontacting Dr. Rosen to seek a clarification of his findings. Proper deference to Dr. Rosen's opinion also may have led to a disability finding for Finess.

The Final Rules also provide that a child should be evaluated not only in what she "cannot do," but also in what she has "difficulty doing, needs help doing, or is restricted from doing" because of her impairments. 65 Fed.Reg. at 54756. This new instruction might have affected the assessment of Finess, whose impairments do not so much *prevent* her from undertaking any activities as they restrict and limit her. Lastly, the more detailed guidance and examples given with each of the six domains, particularly for the acquiring and using information, interacting and relating with others, and attending to and completing tasks domains, may affect the determination in Finess' case. 65 Fed.Reg. at 54756. Indeed, the new definition of "attention" in the "attending to and completing tasks" domain describes "levels of alertness, concentration, and the initiating, sustaining, and changing of focus" as well as "performing tasks at an appropriate pace, within appropriate timeframes," all areas in which Finess has been documented to have longstanding problems. 65 Fed.Reg. at 54759. Hence, an application of the Final Rules by the Appeals Council to the ALJ's decision should have included at least some mention of these potential differences in outcome raised by the rule change. Since the Appeals Council letter is silent regarding these material differences, meaningful review by this Court is not possible. Hence, a remand to the Commissioner to ensure the application of the Final Rules is justified.

A remand is furthermore necessary because it is unclear to this Court how exactly it should engage in a substantial evidence review. Indeed, under the language of the preamble to the final regulations, this Court is bound to review the Commissioner's determination utilizing the law that was in place at the time the Commissioner's final decision was made. 65 Fed. Reg. at 54750. In this case, the Commissioner's final decision was made on June 15, 2001, the date the Appeals Council denied the plaintiff review. Thus, this Court should utilize the Final Rules to evaluate whether the Commissioner's de-

---

**7.** Marked limitations are those that are equivalent to "the functioning one would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." § 416.926a(e)(2)(i). The mean for IQ tests is 100, with a standard deviation of 15. 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 112.00(C)(9). Hence, an IQ of 65 would be more than two (70) but less than three (55) standard deviations below the mean.

termination is supported by substantial evidence.

However, to attempt to review the Commissioner's decision for substantial evidence utilizing the Final Rules is a bit like comparing apples and oranges, since the ALJ's decision was made under a completely different rule regime-namely, the Interim Rules. It is not clear how exactly this Court should engage in this inquiry-should it assess whether the ALJ had substantial evidence to support his decision had it been made under the Final Rules, even though he made it under the Interim Rules? Should it assess the sufficiency of the evidence utilizing the five broad areas or the six domains? The fairest course is to remand this case to the Commissioner for a complete readjudication under the Final Rules. That way, it is clear that the claimant is getting the proper review under the correct set of applicable rules.

### CONCLUSION

Since it is not clear from the record that the Appeals Council applied the Final Rules rather than the Interim Rules to its review of plaintiff's case, and because changes in the rules may affect the outcome of plaintiff's case, a remand to the Commissioner for re-adjudication by an ALJ under the Final Rules is appropriate. The Clerk of the Court is ordered to close the case.

SO ORDERED.