**Detra POLLARD, Plaintiff–Appellant,**

v.

**William HALTER, Commissioner of Social Security, Defendant–Appellee.**

**No. 03–6007.**

United States Court of Appeals, Second Circuit.

Argued: Feb. 25, 2004.

Decided: July 23, 2004.

Carolyn A. Kubitschek, Lansner & Kubitschek, New York, NY, for Plaintiff–Appellant.

Som Ramrup, Special Assistant United States Attorney for the Eastern District of New York (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Varuni Nelson, Kathleen A. Mahoney, and Elliot M. Schachner, Assistant United States Attorneys for the Eastern District of New York, on the brief), Brooklyn, NY, for Defendant–Appellee.

Before: STRAUB, POOLER, and B.D. PARKER, Circuit Judges.

POOLER, Circuit Judge.

On July 30, 2001, Detra Pollard, on behalf of her son David Pearson, *pro se*, brought this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of the Social Security Administration ("SSA" or "Commissioner"), dated September 20, 2000, finding David ineligible for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. She claims that the Commissioner erred in denying disability benefits to David by failing to consider new evidence regarding the severity of David's attention deficit hyperactivity disorder ("ADHD") and oppositional defiant disorder ("ODD"), as well as evidence regarding neurological and chemical imbalances in his brain. A. 8. We find that the district court erred in applying outdated SSA regulations in reviewing David's claim. Moreover, we find that the new evidence was material and should have been considered. Accordingly, we reverse and remand to the district court with instructions to remand the matter to the Commissioner for further proceedings consistent with this opinion.

## BACKGROUND

David was born in 1991 and has been allegedly disabled since August 1995 due to ADHD and ODD. Ms. Pollard initially filed an application for SSI benefits on David's behalf in November 21, 1997, which application was denied in April 1999. On July 29, 1999, an application for reconsideration was denied. On August 22, 2000, a hearing was held before the Administrative Law Judge (Martin K. Kahn, *J.*), in which Ms. Pollard proceeded *pro se* on David's behalf. At the hearing, the ALJ heard testimony from Ms. Pollard, David, and a medical expert.

Ms. Pollard testified that David takes Ritalin three times a day and had done so since he attended the first grade. She testified that David chewed his fingers until they bled, was hard to manage, and got into fights with other students and teachers. She also stated that she has had to call the fire marshal because David lit balls on fire, and that he threw rocks and broken glass, sometimes at cars.

Dr. Allan D. Rothenberg, a pediatrician, testified that while David's social limitations were marked, he was not "extremely limited" in any areas of social or personal functioning. Dr. Rothenberg testified as well that although David had social and behavioral problems, they were "fairly well controlled," and that he had less than marked problems in areas other than social development, such as cognition and communication, or concentration, persistence and pace.

The ALJ also considered numerous documentary reports and evaluations. The following school reports from academic years of 1995 and 1996 were before the ALJ:

(1) In October 1995, David was first examined at the age of four and a half.

Admin. R. 130–31. A report, captioned "Individualized Education Program," indicates that David had a normal IQ of 96, and average cognitive and functioning skills. This report, however, also notes that he suffers from certain "behavioral issues," which could present a "major concern and require immediate attention." Id. at 130–31. Finally, the report conducts a multiaxial assessment and ranks David's Global Assessment of Functioning[1] at 50, in a range of 1 to 100. Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. (American Psychiatric Ass'n 1994) ("DSM") at 32.

(2) A psychological evaluation, prepared in October 1995, by Evelyn Finestone, M.S., a school psychologist with " 'On Our Way' Learning Center." It recalls Ms. Pollard as reporting that teachers must give David "special attention to settle him down and [that] he 'ticks off for no apparent reason,' " Admin. R. 171, and also that "[w]hen walking in the street, David reportedly throws things that are dangerous, like bottles and rocks, and he plays angry, violent games. Imaginative play usually involves shooting and killing." It observes that although he appeared to have "good communication skills," "David eyed [the] examiner suspiciously, never appeared related, never smiled and generally responded to both formal and informal questions with arrogance. . ." The evaluation, however, observes that David's adaptive behaviors, functional motor skills, and daily living skills, all appear adequate.

(3) A letter dated November 17, 1995, by Barbara Frankel, M.S., the Educational Director of " 'On Our Way' Learning Center" which notes that,

based on psychological testing, David functioned "in the average range of intelligence." Admin. R. 167. Ms. Frankel also states that, although David "exhibits hostile, aggressive behavior," he was still within a "normal" range and recommends that he continue to be enrolled in a regular preschool program.

(4) An evaluation, dated December 7, 1995, captioned "Individualized Education Program," which classifies David as a "preschool student with a disability" and recommends that he be placed in a "special class in an integrated setting." Admin. R. at 126.

The following psychological and psychiatric evaluations were also before the ALJ:

(1) An evaluation captioned "Psychosocial/Psychiatric Consultation," dated January 19, 1996, prepared by Dr. Bradford Tepper, a psychiatrist with the Rockaway Youth Consultation Center, Admin. R. 150–53, diagnoses David with ADHD and ODD, and recommends that David receive therapy and medication.

(2) An evaluation performed by Dr. Shelia Solis, indicates that David's limitations were "fairly controlled with medication[,] [although he] continues to be oppositional," frustrated and difficult to manage. Admin. R. 142–43. In another evaluation in October 1997, Dr. Solis again notes that David "hits children, fails to finish his work, cannot sit still, [and] crawls under the desk. Once, he tried to open the emergency exit in the bus." Id. at 149.

(3) In May 1999, Dr. Kwang Lee reported that David's social/emotional skills were not age appropriate. He notes that David took Ritalin three times a

---

**1.** The Global Assessment of Functioning (GAF) Scale (DSM—IV Axis V) ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. DSM at 32. A GAF range of 41–50 indicates that the individual has a "serious impairment in one of the following: social, occupational, or school functioning."

day and attended weekly psychotherapy sessions. Dr. Lee apparently examined David again in May 1999, in which he found that his motor skills, sensory abilities, communication skills and cognitive skills were age appropriate, but that his social and emotional skills were not.

(4) A report prepared by Dr. Michael Bernstein, dated April 13, 1999, for the New York State Department of Temporary and Disability Assistance, following a consultative examination of David on March 25, 1999. This report notes that David was "hyperactive, impulsive and aggressive and distractible at school" and "frequently defiant" at home, but also that David is "generally happy and easily contented with his Nintendo 64 or watching t.v." It observes, however, that David's mother reported difficulty controlling him, and that he, on one occasion, "took a hammer and smashed the wall." Moreover, the report mentions that David "appeared to have either low average or borderline IQ," but concludes that David was "appropriately placed in the appropriate after school therapeutic program." Admin. R. 183.

(5) A report, dated April 19, 1999, prepared by Dr. J. Pauporte, a non-examining consultative physician for the SSA. This report notes that David, by then eight years old, had ADD and ODD, which caused a "severe" impairment. His condition, however, "[did] not meet, medically equal, or functionally equal the severity of a listing." Admin. R. 186–87. It describes David's cognitive/communicative, social, personal, and concentration, persistence or pace limitations as "less than marked," but concludes, however, that David's behavior had improved because of his medication.

On September 20, 2000, the ALJ issued a decision rejecting Ms. Pollard's claim. Citing several of the academic and medical reports listed above, the ALJ concluded that, under interim SSA regulations, David's ADHD and ODD symptoms did not meet or were medically equal to any listed impairments. It also found that David's impairments, though severe, were not "functionally equivalent in severity" to one or more of the listed impairments.

On October 13, 2000, Ms. Pollard filed a request for a review of the ALJ's determination. On June 27, 2001, the SSA's Appeals Council denied her request without providing any legal or fact specific reason for doing so. It also summarily concluded that new SSA regulations, which had gone into effect while Ms. Pollard's request for review was pending before the Appeals Council, provided no basis for reversing the ALJ's determinations.

On August 7, 2001, Ms. Pollard filed a *pro se* complaint in the Eastern District of New York seeking review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). After obtaining several extensions of time, on June 4, 2002, nearly a year after Ms. Pollard initiated her court action, the Commissioner moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).

On December 16, 2002, the district court granted the Commissioner's motion and dismissed Ms. Pollard's complaint. *Pollard v. Barnhart*, No. 01–CV–5503 (E.D.N.Y. Dec. 16, 2002). The district court reviewed Ms. Pollard's claim using the interim SSA regulations, which were applied by the ALJ, as opposed to new SSA regulations that had recently gone into effect. The court reasoned that "[n]othing in the record indicates that any of David's specific functions are limited," *id.* at 13, and found that the ALJ had reasonably determined that "David's social functioning is markedly, but not extremely, limited," and that David has a "less than marked limitation" in the areas of "cognitive and communicative development" and

"concentration, persistence and pace." *Id.* at 13, 14, 16. The district court also found that David had no limitation in the area of "personal development." *Id.* at 15.

On January 8, 2003, Ms. Pollard notified the district court that her attorney had failed to pursue her appeal. On January 29, 2003, Ms. Pollard moved for reconsideration, alleging that she had new evidence regarding the severity of David's condition, and submitted the following documents:

(1) A letter, dated January, 21, 2003 from the Brian Piccolo School, signed by Ilene Pollack, a guidance counselor, which notes that David currently received counseling twice a week. The letter states that in 2001 or 2002, David was hospitalized at the psychiatric ward at St. John's Hospital after threatening to kill a teacher. It also notes that David "has physical addictions, such as continuous gnawing at his fingers and fingernails. He bites on all objects, shirts, towels, string, plastic or anything he can chew. David bangs on furniture, doors, windows and tables incessantly at home." The letter concludes that Ms. Pollard has been advised to enroll him in a 30–day treatment program at Queen's Children's Center.

(2) A letter, dated May 28, 2003, by Ms. Pollard, states that David had been hospitalized at the Queens Children's Psychiatric Hospital.

(3) A letter,dated January 23, 2003, by Alyson Lemard, a social worker intern with Safe Space Family Life Clinic reports that David was currently receiving mental health services, specifically "special education services due to emotional disturbance."

(4) A psychiatric assessment, dated November 5, 2002, concludes that David's Global Assessment of Functioning was only 40, on a scale of 1–100. A score of 40 indicates "major impairment in sever-al areas, such as work or school, family relations, judgment, thinking, or mood." DSM at 32.

On May 22, 2003, after obtaining two extensions of time, defendant moved to oppose Ms. Pollard's motion to vacate, alter and amend the judgment. On July 10, 2003, the district court denied Ms. Pollard's motion for reconsideration. *Pollard v. Barnhart,* No. 01–CV–5503 (E.D.N.Y. July 10, 2003). The court concluded that none of the new evidence submitted by Ms. Pollard was "material" because it was generated in late 2002 and early 2003, and made no mention of David's condition between August 1995 (the alleged onset date) and September 20, 2000 (the date of the ALJ's decision). Because the evidence did not "pertain to the time period for which benefits were denied, ... [t]he court could not have taken the documents into consideration upon reviewing the ALJ's decision." Order at 3–4. The court noted that although the new evidence suggested that David's condition is worsening, since the "court is not a tribunal of first instance," Ms. Pollard should reapply with the SSA. *Id.* at 4.

### DISCUSSION

"We review the administrative record *de novo* to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel,* 276 F.3d 103, 108 (2d Cir.2002); *see* 42 U.S.C. § 405(g). The Supreme Court has defined "substantial evidence" as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Although

factual findings by the Commissioner are "binding" when "supported by substantial evidence," "[w]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal." *Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir.1984) (internal quotation marks and citations omitted).

## I. *Governing SSA Regulations For Defining Childhood Disability*

To qualify for disability benefits, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Pursuant to this statutory dictate, the SSA has enacted a three-step sequential analysis to determine whether a child was eligible for SSI benefits on the basis of a disability. 20 C.F.R. § 416.924(a). First, the ALJ considers whether the child is engaged in "substantial gainful activity." *Id.* at § 416.924(b). Second, the ALJ considers whether the child has a "medically determinable impairment that is severe," which is defined as an impairment that causes "more than minimal functional limitations." *Id.* at § 416.924(c). Finally, if the ALJ finds a severe impairment, he or she must then consider whether the impairment "medically equals" or, as is most pertinent here, "functionally equals" a disability listed in the regulatory "Listing of Impairments." *Id.* at § 416.924(c)-(d); *Id.* at pt. 404, subpt. P.

## A. *Functional Equivalence under the Interim Rules*

In 1996, under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, H.R. 3734, 104th Cong. (1996), Pub.L. No. 104–193, §§ 211 to 212 (the "Welfare Reform Act"), Congress substantially revised the definition of disability for children seeking SSI benefits. The revisions focus specifically on "whether a child's impairment was 'functionally equivalent' to a listed disability." *Kittles ex rel. Lawton v. Barnhart,* 245 F.Supp.2d 479, 488 (E.D.N.Y.2003); *see also Encarnacion ex rel. George v. Barnhart,* 331 F.3d 78, 83 (2d Cir.2003). The SSA, charged with promulgating new regulations in conformance with the Welfare Reform Act, issued "interim final rules," which became effective April 14, 1997 ("Interim Rules"). 62 Fed. Reg. 6408, 6422 (Feb. 11, 1997); 20 C.F.R. § 416.924(d) (1997). The Interim Rules were in effect until January 2, 2001, when the final rules went into effect. *See* 65 Fed.Reg. 54,747 (Sept. 11, 2000).

"Under the Interim Rules, if a child's impairment or combination of impairments did not match a listed impairment, the ALJ was to consider all of the child's 'functional limitations' namely, what the child could not do because of his or her impairment—to determine whether the impairment was functionally equivalent to a listed impairment." *Kittles,* 245 F.Supp.2d at 488 (citing 20 C.F.R. § 416.926(a) (1997)). A child's impairment would be found functionally equal to a listed impairment if the child's condition resulted in (1) "extreme limitation of one specific function, such as walking or talking" or (2)(a) "extreme limitations in one [broad] area of functioning" or (b) "marked limitation in two [broad] areas of functioning." 20 C.F.R. § 416.926a(b)(1)-(4) (1998). The Interim Rules lists the following five broad areas of functionality:

(1) cognitive/communicative development;

(2) motor development;

(3) social development;

(4) personal development; and

(5) concentration, persistence, or pace.

20 C.F.R. § 416.926a(c)(5)(iii) (1998).

### B. Functional Equivalence under the Final Rules

On September 11, 2000, the SSA published the Final Rules implementing the Welfare Reform Act, which became effective January 2, 2001 (the "Final Rules"). Supplemental Security Income; Determining Disability for a Child Under Age 18, 65 Fed.Reg. 54,747 (Sept. 11, 2000) (codified at 20 C.F.R. pts. 404, 416). Although the first two steps of the evaluation process remained largely the same, the Final Rules replaced the Interim Rule's "five broad areas of functioning" with an inquiry into a child's functioning in "six domains." 65 Fed.Reg. 54,747; *see also Encarnacion*, 331 F.3d at 85 & n. 3, 4; *Booker–Shelton ex. rel. Booker–Morgan v. Barnhart*, 266 F.Supp.2d 818, 821 (N.D.Ill.2003). These six domains consider the child's ability:

(1) to acquire and use information;

(2) to attend and complete tasks;

(3) to interact and relate with others;

(4) to move about and manipulate objects;

(5) to care for oneself; and

(6) health and physical well-being.

20 C.F.R. § 416.926a(a)-(b) (2001). As with the Interim Rules, in order to demonstrate functional equivalence under the Final Rules, the child must exhibit a "marked" limitation in two of the domains, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). Under the Final Rules, an impairment is a "marked limitation" if it "interferes seriously with [a person's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). By contrast, an "extreme limitation" is defined as a limitation that "interferes *very* seriously with [a person's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i) (emphasis added).

### II. The Final Rules Apply

 As a preliminary matter, we must consider whether the Interim Rules or Final Rules govern judicial review of the ALJ's decision.[2] In this case, when the ALJ issued his decision on September 20, 2000, the Interim Rules were in effect. While Ms. Pollard's request for review by the Appeals Council was pending, the Final Rules went into effect. We now join the Seventh and Eighth Circuits, the only

---

**2.** Defendant argues that Ms. Pollard failed to argue below that the district court was required to utilize the Final Rules rather than the Interim Rules, and has therefore waived this argument on appeal. Ltr. from Som Ramrup, SAUSA, Commissioner of Social Security, to the Court at 1 (May 6, 2004) ("Ramrup Ltr."). This Court, however, retains "broad discretion to consider issues not timely raised below," and will be more inclined to do so if "either (1) consideration of the issue is necessary to avoid manifest injustice or (2) the issue is purely legal and there is no need for additional factfinding." *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 159 (2d Cir.2003) (citations and quotations omitted). In this case, the issue of whether the Interim or Final Rules apply to a judicial review of the ALJ's decision is purely a legal question, requiring no development of the facts. Moreover, Ms. Pollard's claim is a sympathetic one. After several years of litigating her claims, oftentimes proceeding *pro se*, we will not now dismiss her claim based on regulations that are no longer in effect simply because she failed to raise this issue below. Accordingly, Ms. Pollard's failure to argue before the district court that the Final Rules apply to her claim does not prevent us from ruling on this issue.

two circuits that have considered this issue, in holding that, where, as here, the Final Rules went into effect while the claimant's application was pending before the Appeals Council, the Final Rules, rather than the Interim Rules applied by the ALJ, govern the review of the ALJ's decision. *Keys v. Barnhart,* 347 F.3d 990, 994 (7th Cir.2003) (followed by the D.C. district court in *Morgan v. Barnhart,* 2004 WL 254577, at *5 (D.D.C. Feb.4, 2004)); *Garrett v. Barnhart,* 366 F.3d 643, 647 (8th Cir.2004).[3] We adopt this approach for three reasons. First, the SSA's "Explanation of the Effective Date" of the Final Rules explicitly holds that any SSI application, if pending when the Final Rules become effective, should be evaluated under the Final Rules. It further provides that the Final Rules apply "to the entire period at issue for claims that are pending *at any stage* of our administrative review process." 65 Fed.Reg. 54,751 (emphasis added). Second, the SSA instructs courts to apply the Final Rules if the case was pending before the SSA when the Final Rules went into effect. The comments note that "[w]ith respect to claims in which we have made a final decision, and that are pending judicial review in Federal court, we expect that the court's review of the Commissioner's final decision would be made in accordance with the rules in effect at the time of the final decision." 65 Fed. Reg. 54,751. Third, it is reasonable for the courts to apply the Final rather than Interim Rules in reviewing the ALJ's determination. Indeed, if we were to hold

the opposite, so that the Interim Rules governed our review, then an administrative decision would be affirmed based on outdated regulations, rendering our efforts "merely [an] academic exercise." *Booker–Shelton,* 266 F.Supp.2d at 823.

Like the Seventh and Eighth circuits, we find that a "final decision" by the SSA is rendered when the Appeals Council either considers the application on the merits or declines a claimant's request for review, and not simply when the ALJ issues its decision. *Keys,* 347 F.3d at 992–93; *Garrett,* 366 F.3d at 647. In this case, Ms. Pollard's claim was pending before the SSA when the Final Rules became effective. Consequently, when the Appeals Council declined to review her case on August 1, 2001, the disposition of her claim became final. Although the ALJ analyzed Ms. Pollard's claim using the Interim Rules, the Final Rules govern the judicial review of her claim. Thus, the district court's application of the Interim Rules rather than the Final Rules was error and compels a remand to the Commissioner.

### III. *Harmless Error Analysis*

Defendant argues that, since there is little difference between the Interim and Final Rules, the latter does not compel reversal of the district court, rather, we may simply review the administrative record using the Final Rules. As support for this approach, defendant cites to *Keys v. Barnhart,* in which the Seventh Circuit held that the Final rather than Interim

---

**3.** Although the court in *Garrett* noted that neither party addressed the issue of whether the Interim or Final Rules applies, 366 F.3d at 651 n. 3, we do not feel that this diminishes the weight of the Eighth Circuit's holding. *See United States v. Pierre,* 781 F.2d 329, 333 (2d Cir.1986) ("the absence of briefing does not distinguish a dictum from a holding") (citations omitted); *see also Monell v. Dep't of Social Services,* 436 U.S. 658, 709 n. 6, 98

S.Ct. 2018, 56 L.Ed.2d 611 (1978) (Powell, J., concurring) ("the mere fact that an issue was not argued or briefed does not undermine the precedential force of a considered holding"). Indeed, the Commissioner acknowledges that *Garrett* stands for the proposition that courts should apply the Final Rules if the case was pending before the SSA when the Final Rules went into effect. Ramprup Ltr. at 3.

Rules applied, but then reviewed the ALJ's decision under the Final Rules and concluded that any error resulting from the ALJ's application of the Interim Rules was harmless. 347 F.3d at 994–95.

■ We decline to adopt this approach in this case. As an initial matter, the Seventh Circuit noted that in "many cases" it would be improper to review an ALJ's decision when it was based on regulations no longer in effect. *Id.* at 994. The court, however, then found that the case before it was an exception because it was clear "that the [ALJ's] factual determinations would compel a denial of benefits under the new regulations as well as under the old." *Id.* By contrast, we perceive this case to be a close one. The error was not harmless because there is a substantial possibility that Ms. Pollard might have prevailed under the Final Rules had they been applied.

As found by the Eastern District of New York, "[t]he Final Rules ... are *materially* different from the Interim Rules on several fronts, reflecting the SSA's desire to simplify and clarify the rules for both adjudicators and the public." *Kittles,* 245 F.Supp.2d at 488 (citing 65 Fed.Reg. at 54,755–56 (emphasis added)). Most importantly, functional equivalence is evaluated based on different categories of considerations. *See Morgan,* 2004 WL 254577, at *3 (noting that the "most significant change in the final regulations is with respect to the analysis required for the determination of whether the child's impairment results in a limitation that is 'functionally equal' to the listings"). The Interim Rules consider "five broad areas of functioning," which include: (1) cognitive/communicative development, (2) motor development, (3) social development, (4) personal development, and (5) concentration, persistence, or pace, 20 C.F.R. § 416.926a(c)(5)(iii) (1998), while the Final Rules utilize "six domains," which include

the child's ability: (1) to acquire and use information; (2) to attend and complete tasks; (3) to interact and relate with others; (4) to move about and manipulate objects; (5) to care for oneself; and (6) health and physical well-being, 20 C.F.R. § 416.926a(a)-(b) (2001). The two tests are not analogous in substance. For example, it is unclear whether limitations represented by the broad areas of "cognitive development" and "motor development" under the Interim Rules are and to what extent comparable to the single domain of "acquiring and using information" or "attending and completing tasks" under the Final Rules. It is also unclear whether findings under the broad area of "personal development" under the Interim Rules are and to what extent comparable to the domains of "caring for oneself" and "health and physical well-being" under the Final Rules. These shifts are significant in this case because there is some evidence that David does have limitations that fall in the domains of "caring for oneself," "health and physical well-being," and, seeing as how he is suffering from ADHD, "attending and completing tasks."

Finally, it is of no moment that the Appeals Council held that the outcome of Ms. Pollard's claim would have been the same under either the Interim or Final Rules. The Appeals Council's refusal to review Ms. Pollard's claim does not amount to a consideration on the merits; rather, it was merely a refusal to engage in any substantive review of her claim. The Appeal Council's denial of a request for review is analogous to a denial of certiorari, and it is notable that the Supreme Court has previously found that "the denial of certiorari ... imports no expression of opinion upon the merits of a case." *C.f., House v. Mayo,* 324 U.S. 42, 48, 65 S.Ct. 517, 89 L.Ed. 739 (1945). Moreover, the Appeals Council's conclusion that the "new

regulations do not provide a basis to change the Administrative Law Judge's decision," is cursory, formulaic, and not supported by any legal or factual reasoning. Indeed, in two district court cases involving the same or similar language by the Appeals Council, both courts doubted whether the Appeals Council actually applied the Final Rules. *See Kittles,* 245 F.Supp.2d at 491; *Booker–Shelton,* 266 F.Supp.2d at 823. In *Booker–Shelton,* the district court refused to credit the Appeals Council's statement that the Final Rules provided no basis to challenge the ALJ's determination because the Appeals Council failed to "sufficiently articulate the assessment of the evidence to assure the court that the important evidence was considered." 266 F.Supp.2d at 823. The court characterized this statement as "at best, a band-aid applied to salvage the outdated ALJ's decision, to supply alternate grounds to support it." *Id.* In this case, we likewise refuse to credit the unsupported conclusion by the Appeals Council that Ms. Pollard's application would have failed under the Final Rules. We conclude that a remand to the SSA for reconsideration under the Final Rules is necessary.

## II. *New Evidence*

■ We find that the district court erred in holding that the new evidence submitted by Ms. Pollard categorically cannot be considered because it was not material. The court based its finding of non-materiality on the fact that the new evidence did not explicitly refer to the relevant time period. We, however, conclude that the new evidence was material. On remand, the Commissioner should consider this new evidence in conjunction with the existing administrative record. *See Shalala v. Schaefer,* 509 U.S. 292, 297 n. 2, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993).

42 U.S.C. § 405(g) provides, in pertinent part, that "[t]he court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Because the new evidence submitted by Ms. Pollard did not exist at the time of the ALJ's hearing, there is no question that the evidence is "new" and that "good cause" existed for her failure to submit this evidence to the ALJ.

The only issue, then, is whether this evidence is "material." New evidence is "material" if it is both (1) "relevant to the claimant's condition during the time period for which benefits were denied" and (2) "probative." *Tirado v. Bowen,* 842 F.2d 595, 597 (2d Cir.1988) (internal quotation marks omitted). "The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Id.*

*First,* we find that the new evidence was relevant to the time period for which benefits were denied. Although the new evidence consists of documents generated after the ALJ rendered his decision, this does not necessarily mean that it had no bearing on the Commissioner's evaluation of Ms. Pollard's claims. To the contrary, the evidence directly supports many of her earlier contentions regarding David's condition. It strongly suggests that, during the relevant time period, David's condition was far more serious than previously thought and that additional impairments existed when David was younger. Indeed, "[w]e have observed, repeatedly, that evidence bearing upon an applicant's condition subsequent to the date upon which the earning requirement [i.e., insured status]

was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date or may identify additional impairments which could reasonably be presumed to have been present. . . ." *Lisa v. Secretary of Dep't of Health and Human Serv.*, 940 F.2d 40, 44 (2d Cir.1991) (internal quotation marks omitted). Accordingly, the district court erred insofar as it categorically refused to consider the new evidence submitted by Ms. Pollard because the evidence was generated post–2000 and did not explicitly discuss David's condition during the relevant time period.

*Second,* we find that the new evidence was probative and likely to affect the ALJ's consideration of Ms. Pollard's claim. To demonstrate functional equivalence under the Final Rules, the child must exhibit a "marked" limitation in two of the domains, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). It is without dispute that David has a marked limitation in the domain of "interacting and relating with others." 65 Fed.Reg. at 54,-759. Based on the new evidence submitted by Ms. Pollard, such as the fact that David has threatened to kill a teacher and has since been hospitalized in a psychiatric ward, the ALJ might be persuaded to find that, during the relevant time period, David was actually extremely limited in his ability to interact and relate to other people.

In addition, the new evidence also suggests that David may have had a marked limitation in the domain of "caring for oneself." 20 C.F.R. § 416.926a(k). SSA regulations explain that this involves "how well [the claimant] maintain[s] a healthy emotional and physical state, including how well [the claimant gets his or her] physical and emotional wants and needs met in appropriate ways; how [he or she] cope[s] with stress and changes in [his or her] environment." 20 C.F.R. § 416.926a(k). For children between the ages of 6 to 12, "caring for oneself" is shown by demonstrating "consistent control over [his or her] behavior, and [being] able to avoid behaviors that are unsafe or otherwise not good for [him or her]." 20 C.F.R. § 416.926a(k)(1)(iv).

At the administrative hearing, Ms. Pollard testified that David chews his fingers until they bleed, that he is very hard to manage, plays with fire, throws broken glass, and makes holes in the wall at home. The ALJ did not credit this testimony because it was not corroborated by other evidence, notwithstanding the fact that Dr. Solis had submitted a report that noted that David had previously attempted to open the emergency exit on a bus. The new evidence further reinforces Ms. Pollard's contention that David is also self-destructive and a potential harm as much to himself as he is to others. In a letter to Ms. Pollard, a guidance counselor with the Brian Piccolo School notes that David "has physical addictions, such as continuous gnawing at his fingers and fingernails. He bites on all objects, shirts, towels, string, plastic or anything he can chew. David bangs on furniture, doors, windows and tables incessantly at home." In this way, the new evidence is pertinent to and probative of David's ability to maintain a healthy emotional and physical state during the relevant time period. In sum, the new evidence, analyzed in conjunction with the administrative record, creates at minimum a reasonable possibility that, under the Final Rules, the Commissioner would find that David has either an extreme limitation in the domain of "interacting and relating with others" or a marked limitation in this domain and in the domain of "caring for oneself."

## CONCLUSION

For the reasons stated above, we reverse and remand to the district court with

instructions to remand the matter to the Commissioner so that it can consider the new evidence in conjunction with the administrative record to determine David's entitlement to SSI benefits under the Final Rules. In light of significant delays in this case, many of which were not Ms. Pollard's fault—she has, in fact, has been exceptionally diligent in prosecuting this case—we think it best that the Commissioner disposes of this case as expeditiously as possible.