16-2189-cv
*MacNeil v. Berryhill*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2016

(Argued: May 2, 2017          Decided: August 24, 2017)

No. 16-2189

_____

SHARON MACNEIL, on her own behalf and on behalf of her minor
children A.T.M. and C.E.M.,

*Plaintiff-Appellant,*

-v.-

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

*Defendant-Appellee.*

_____

Before:      WALKER, LIVINGSTON, and LYNCH, *Circuit Judges.*

Plaintiff-Appellant Sharon MacNeil ("MacNeil") brought suit pursuant to 42 U.S.C. § 405(g) challenging a decision by the Commissioner of the Social Security Administration that her children—twins conceived via *in vitro* fertilization eleven years after her husband died—were ineligible for survivors' insurance benefits.   The United States District Court for the Northern District of New York (Sharpe, *J.*) affirmed the agency's decision, concluding that under the applicable provisions of New York's Estates, Powers and Trusts Law ("EPTL") the children were not entitled to inherit under New York state intestacy law, and

1

so were not children of the deceased wage earner within the meaning of the relevant Social Security Act provisions. We agree and accordingly AFFIRM the district court's judgment.

Judge LYNCH concurs in the judgment and in the opinion of the Court and files a separate concurring opinion.

FARA TABATABAI (Hagit M. Elul, on the brief), New York, New York, *for Plaintiff-Appellant*.

SANDRA M. GROSSFELD (Stephen P. Conte, on the brief), New York, New York, *for* Grant C. Jaquith, Acting United States Attorney for the Northern District of New York, Syracuse, New York, *for Defendant-Appellee*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Plaintiff-Appellant Sharon MacNeil ("MacNeil") conceived twins via *in vitro* fertilization eleven years after her husband, the donor spouse, died. After the children—A.T.M. and C.E.M.—were born, MacNeil filed applications for child's survivors' benefits, based on her husband's earnings history, with the Social Security Administration ("SSA"). As relevant here, the SSA has interpreted the governing statute—in an interpretation upheld by the Supreme Court—to treat an individual as a child of the decedent-insured, and thus potentially eligible for survivors' benefits, if that individual would inherit from

2

the decedent under the intestacy law of the state in which the insured was domiciled. An Administrative Law Judge ("ALJ") denied the twins' applications for benefits, concluding that, under the version of the New York law in effect at the time of the decision, children conceived and born after a decedent's death were not entitled to inherit by intestacy.

MacNeil then filed suit in the United States District Court for the Northern District of New York challenging this determination, and the district court affirmed the agency's view. We agree with the district court that, under the applicable provisions of New York's Estates, Powers and Trusts Law ("EPTL") in effect at and prior to the time of the agency's final decision, A.T.M. and C.E.M. were not entitled to inherit from the decedent in intestacy. In the absence of any showing of other grounds for eligibility for child's survivors' benefits under the Social Security Act, we affirm the judgment of the district court.

## BACKGROUND

### I. Factual Background[1]

Sharon and Eric MacNeil were married on October 1, 1994, a year after they graduated from college. Several months into their marriage, Eric was

---

[1] The factual background presented here is derived from undisputed facts from the administrative record of the agency proceedings, as filed by the SSA in the district court.

diagnosed with non-Hodgkin's lymphoma at the age of 23. The couple, knowing that the cancer might be terminal or that treatment might render Eric sterile, decided to bank Eric's sperm. Eric died intestate on May 24, 1996, at age 24. In June 2007, eleven years after Eric's death, Sharon underwent *in vitro* fertilization using the stored sperm. She gave birth to twins, A.T.M. and C.E.M., on February 14, 2008.

## II.   Procedural History

On October 8, 2009, MacNeil filed separate applications for child's survivors' benefits for her twins with the SSA, based upon the wage earnings of their deceased father. The SSA denied these applications, and MacNeil then sought a hearing before an ALJ. The only question presented before the ALJ was a legal one: whether A.T.M. and C.E.M. qualified as "child[ren]" under the Social Security Act. The ALJ concluded that, though it was uncontested that the twins were biologically Eric MacNeil's children, they were not entitled to inherit under the applicable provisions of New York intestacy law because they were conceived after Eric's death. As a result, on February 14, 2013, the ALJ issued two separate and identical decisions denying MacNeil's applications for each of

4

her children.  The SSA's Appeals Council denied MacNeil's paired petitions for review.

On November 18, 2014, MacNeil filed suit against the Commissioner of the SSA in the United States District Court for the Northern District of New York, seeking review of the agency's final determination under 42 U.S.C. § 405(g). The magistrate judge (Hummel, *M.J.*) issued a Report & Recommendation ("R&R") proposing that the SSA's denial of benefits be affirmed.  The district court (Sharpe, *J.*) adopted the R&R in full and dismissed MacNeil's complaint. On June 24, 2016, MacNeil timely appealed.

## DISCUSSION

When reviewing a final decision of the Commissioner in a Social Security benefits case, this Court examines the administrative record *de novo* to determine, as relevant here, whether the SSA applied the correct legal standard.  *See Pollard v. Halter*, 377 F.3d 183, 188 (2d Cir. 2004); *see also* 42 U.S.C. § 405(g).

## I

The Social Security Act affords "a monthly benefit for designated surviving family members of a deceased insured wage earner," including children of the deceased.  *Astrue v. Capato ex rel. B.N.C.*, 566 U.S. 541, 132 S. Ct.

2021, 2027 (2012); *see also* 42 U.S.C. § 402(d). In a definitional section, the Social Security Act provides that "[i]n determining whether an applicant is the child . . . of a fully . . . insured individual for purposes of th[e] subchapter [governing, *inter alia*, survivors' benefits], the Commissioner of Social Security shall apply such law as would be applied in determining the devolution of intestate personal property . . . by the courts of the State in which [the decedent insured] was domiciled at the time of his death." 42 U.S.C. § 416(h)(2)(A). Thus, the SSA has explained, an applicant for child's survivors' benefits may qualify if the applicant "could inherit the insured's personal property as his or her natural child under State inheritance laws." 20 C.F.R. § 404.355(a)(1); *see also Capato*, 132 S. Ct. at 2033-34 (upholding the SSA's interpretation as reasonable under *Chevron v. NRDC*, 467 U.S. 837 (1984)).

Under its internal regulations, the SSA applies the version of state law most beneficial to the applicant, looking to "the version of State law that was in effect at the time the insured died, or any version of State law in effect from the first month for which [the applicant] could be entitled to benefits up until [the] final decision on [the] application." 20 C.F.R. § 404.355(b)(4). In adjudicating the merits of the applications filed on A.T.M. and C.E.M.'s behalf, the ALJ

6

invoked the version of the EPTL in effect at the time of his decision in 2013, and the parties agree that this version of the EPTL properly applies to this case.

**II**

The parties' arguments on appeal center on two sections of New York's EPTL. Section 4-1.1 provides the general rules for distribution of property "not disposed of by will" via intestacy. *See* EPTL § 4-1.1 ("The property of a decedent not disposed of by will shall be distributed as provided in this section."). As relevant here, subsection (a) of Section 4-1.1 sets out the basic rules for allocating a decedent's property "[i]f a decedent is survived by" various relatives including the "spouse," "issue," "parents," and "grandparents."[2] Subsection (b) then states that, in making an intestate distribution, the decedent's half-relatives "shall be treated as if they were [full] relatives." *Id.* § 4-1.1(b). Similarly, subsection (c), the subsection at the center of the dispute between the parties in this case, also identifies individuals who are appropriately included as members of the class of distributees. This subsection provides that

---

[2] For instance, this subsection provides that if a decedent is survived by a spouse and issue, $50,000 and one-half of the residue goes to the spouse with the balance to the issue, whereas in the case of a decedent who is survived by one or both parents, no spouse and no issue, the whole goes to the surviving parent or parents. EPTL § 4-1.1(a).

7

"[d]istributees of the decedent, conceived before his or her death but born alive thereafter, take as if they were born in his or her lifetime."  *Id.* § 4-1.1(c).

The second section, Section 4-1.2, governs the circumstances under which "non-marital children" are considered legitimate issue under the provisions of intestacy law.   Under this provision, a "non-marital child is the legitimate child of his mother so that he and his issue inherit from his mother and from his maternal kindred," just as a marital child does.   *Id.* § 4-1.2(a)(1).   A non-marital child can also be the legitimate child of his father "so that he and his issue inherit" by the terms of this provision, but only in specified circumstances including, as relevant here, where paternity is "established by clear and convincing evidence," such as "evidence derived from a genetic marker test." *Id.* § 4-1.2(a)(2)(C)(i).

The agency argues that Section 4-1.1(c), which specifically provides for distribution of an intestate's property to children conceived *before* the decedent's death who are born thereafter, by implication excludes those children conceived *after* the decedent's death.   MacNeil argues, in contrast, that her twins are entitled to inherit as "non-marital children" under Section 4-1.2 because Eric's biological paternity has been clearly established by genetic testing.   In her view,

8

Section 4-1.1(c) does not prevent posthumously conceived children from inheriting via intestacy because the subsection does not expressly state that *only* distributees conceived before the decedent's death are entitled to inherit. Moreover, she argues, Section 4-1.2, which provides in relevant part that "[a] non-marital child is the legitimate child of his father so that he . . . inherit[s] . . . if paternity has been established by clear and convincing evidence," such as "evidence derived from a genetic marker test," is applicable by its terms. *Id.* § 4-1.2(a)(2)(C)(i).

"The starting point of statutory interpretation is, of course, plain meaning." *People v. Owusu*, 93 N.Y.2d 398, 401 (1999). "It is well settled that 'a statute or legislative act is to be construed as a whole, and all parts of an act are to be read and construed together.'" *N.Y. State Psychiatric Ass'n, Inc. v. N.Y. State Dep't of Health*, 19 N.Y.3d 17, 23-24 (2012) (quoting N.Y. Stat. § 97). Interpretation of one provision of a statute thus "cannot be divorced from its statutory context." *In re Avella v. City of New York*, 2017 WL 2427307, 2017 N.Y. Slip. Op. 04383, at *7 (June 6, 2017). "[E]ach section . . . must be considered and applied in connection with every other section . . . so that all will have their due, and conjoint[,] effect." *N.Y. State Psychiatric Ass'n*, 19 N.Y.3d at 24; *see also* N.Y.

9

Stat. § 98 ("All parts of a statute must be harmonized with each other . . . and effect and meaning must . . . be given to the entire statute and every part and word thereof."). As a result, "a statutory construction which renders one part meaningless should be avoided." *In re Springer v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 27 N.Y.3d 102, 107 (2016) (quoting *Rocovich v. Consol. Edison Co.*, 78 N.Y.2d 509, 515 (1991)). Keeping these principles firmly in mind, we turn back to the parties' arguments.

As we have explained, Section 4-1.1 provides the general rules for intestate distribution. Section 4-1.1's first subsection delineates the hierarchy for distributing the estate to the class of individuals "surviv[ing]" the decedent. EPTL § 4-1.1(a)(1) ("If a decedent *is survived by*: (1) A spouse and issue . . . ." (emphasis added)). Survive, when used as a transitive verb, means "[t]o live longer than; [or] outlive." American Heritage Dictionary of the English Language 1743 (4th ed. 2000). More specifically, Black's Law Dictionary defines "surviving" as "[r]emaining alive; living beyond the happening of an event so as to entitle one to a distribution of property or income." Black's Law Dictionary 1675 (10th ed. 2010). That language necessarily limits the class of distributees because the only individuals who could "live longer than" the decedent or

10

"remain alive" after his death are those *already* alive at the time of the decedent's passing.

Read in this context, Section 4-1.1(c)'s import is clear. That subsection provides that distributees "conceived before [the decedent's] death but born alive thereafter take as if they were born in his or her lifetime." Said differently, Section 4-1.1(c) deems those children conceived before a decedent's death but born alive thereafter as having "survived" the decedent, enabling these individuals to take by operation of Section 4-1.1(a). The treatment of other potential distributees born after the death of the decedent is determined by omission: children who did not "survive" the decedent, or are not otherwise deemed by statute to survive the decedent, do not inherit in intestacy.

MacNeil argues that requisite statutory authorization for inheritance by genetic children conceived after—even long after—the death of the decedent is found in Section 4-1.2. Under her proposed interpretation, pursuant to Section 4-1.2, a man's genetic child may always inherit regardless of the timing and circumstances of conception, so long as paternity is clearly established by genetic testing. That argument misreads Section 4-1.2, which, by its terms, supplies an expansive definition of child legitimacy but nowhere indicates that it

is meant to expand the class of distributees entitled to take from the estate of an intestate decedent *temporally*. In other words, whereas, as the ALJ recognized, Section 4-1.1(c) explicitly operates as an exception to "an otherwise clear demarcation between the rights of those born during the decedent's lifetime and the rights of those who [we]re not" by expanding the class of distributees born during the decedent's lifetime to encompass those born after his death, so long as conceived while he lived, *see* Admin. Rec. 21, 30, Section 4-1.2 does no such thing. That provision does not say that a child born after the death of the genetic father may inherit in intestacy, but instead provides the circumstances under which "[a] non-marital child is the legitimate child of his father," including, among others, when "clear and convincing evidence" of genetic paternity exists. EPTL § 4-1.2. Particularly set against the clear language of Section 4-1.1(c), which explicitly provides for expansion of the class of distributees based on time of conception, Section 4-1.2(a)(2) cannot reasonably be read to similarly expand the class.

In effect, MacNeil seeks to isolate one of Section 4-1.2's several mechanisms for establishing paternity and to have this subprovision serve as the general intestate distribution rule for children born after a genetic father has passed away, relegating Section 4-1.1(c) to a provision that governs in the narrow

12

case in which paternity cannot be clearly established. There is no reason, however, why a distribution rule drastically expanding the class of distributees to include children conceived after the death of their genetic father would be buried in a subparagraph to Section 4-1.2 when the statute explicitly provides (narrowly) for such a temporal expansion in Section 4-1.1(c), the preceding section. Nor is it clear why, under MacNeil's interpretation of Section 4-1.2, the child of an intestate father who is conceived after his death may establish genetic paternity (and so, on her theory, inherit), without affording any such mechanism for establishing the genetic maternity for a child born after the death of a woman.[3]

MacNeil's interpretation is also inconsistent with Section 4-1.2's amendment history. Prior to 2010, Section 4-1.2(a)(2), the specific paragraph on which MacNeil relies, provided for inheritance by a non-marital child in cases where the child was able to establish (1) the "open[] and notorious[]"

---

[3] The differential effect of MacNeil's reading of Section 4-1.2 on men and women is obvious. Under her reading, a man's genetic children are entitled to inherit in intestacy no matter how long after the man's death they are born, whereas no clear statutory mechanism exists in that section that would permit a woman's genetic children to secure the same entitlement. (Whether some other mechanism might exist for establishing genetic maternity, *see, e.g.*, *T.V. v. N.Y. State Dep't of Health*, 929 N.Y.S.2d 139, 143-150 (2d Dep't 2011), is a matter that we need not address here, and that the New York courts are unlikely to address in the present context given the passage, discussed below, of EPTL Section 4-1.3.)

acknowledgment of the child by the putative father during that father's lifetime and (2) that genetic testing or other clear and convincing evidence proved paternity. *See In re Davis*, 812 N.Y.S.2d 543, 544-47 (2d Dep't 2006) (quoting EPTL § 4-1.2(a)(2)(C)); *see also In re Poldrugovaz*, 851 N.Y.S.2d 254, 257-62 (2d Dep't 2008). A non-marital child could also inherit if a "court of competent jurisdiction" declared paternity "during the lifetime of the father," EPTL § 4-1.2(a)(2)(A), the father had "signed an instrument acknowledging paternity," or "a blood genetic marker test" establishing paternity had been administered during the father's lifetime. *In re Davis*, 812 N.Y.S.2d at 545 (quoting §§ 4-1.2(a)(2)(B),(D)). In 2010, the New York Legislature amended Section 4-1.2(a)(2) to ease the evidentiary requirements for a non-marital child to establish legitimacy. Rather than requiring both clear and convincing evidence of paternity (such as a genetic marker test) *and* open and notorious acknowledgment, the 2010 amendments permitted a non-marital child to establish legitimacy by clear and convincing evidence, defined as including *either* a genetic marker test *or* open and notorious acknowledgment. *See Seaton v. Cty. of Suffolk*, 912 N.Y.S.2d 289, 291 (2d Dep't 2010); 2010 N.Y. Sess. Laws Ch. 64 (A.7899-A) (McKinney). MacNeil's contention, therefore, amounts to an

14

argument that the amendment of a subparagraph of a statutory provision dealing with paternity determinations served to revise the entirety of New York's intestacy scheme, creating a default pursuant to which children born after—even decades after—their genetic father's death are properly within the class of distributees for purposes of intestacy. But "legislative bodies generally do not 'hide elephants in mouseholes,'" *Cruz v. TD Bank, N.A.*, 22 N.Y.3d 61, 72 (2013) (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)), and MacNeil has given us no convincing reason to believe that New York's legislature did just that here.

Our view of the proper interpretation of Sections 4-1.1(c) and 4-1.2(a)(2) also coheres with the background rules underlying the EPTL. It is a very long-standing rule of New York law that an estate's distributees are properly determined as of the time of the decedent's death. *See In re Bump's Will*, 234 N.Y. 60, 64 (1922) (explaining that "heirs" in a will should "be interpreted in its natural sense—those who are heirs at the death of the testator"). This background rule, which fixes interests in an estate as of the time of the decedent's death, allows estates to determine their distributees and then close, so serving the state's "proper objective" of the "efficien[t]" and "orderly settlement

15

of estates." *See Trimble v. Gordon*, 430 U.S. 762, 770-71 (1977). And, under our reading, Section 4-1.1(c) gains effect specifically by affording a narrow exception to this general background rule.

MacNeil's interpretation—whereby posthumously conceived children may inherit by intestacy no matter how long after their father's death they were born—runs, on the other hand, directly counter to this general rule. If, as MacNeil suggests, a child conceived decades after the genetic father's death may inherit, an estate might forever remain open or subject to redistribution. For example, if a decedent who dies intestate is survived only by his or her spouse, the entirety of the decedent's estate goes to the spouse. EPTL § 4-1.1(a)(2). If that decedent is survived by his spouse and children, however, the spouse receives "fifty thousand dollars and one-half of the residue," with the remainder being distributed to the decedent's issue. *Id.* § 4-1.1(a)(1). Thus, in order to accomplish the distribution contemplated in Section 4-1.1(a) under her interpretation of Section 4-1.2, a spouse in Sharon MacNeil's position could be required to return half of the estate (saving fifty thousand dollars for herself) and devise that portion to the children born long after her husband's death. Redistribution would become yet more complicated where grandchildren are

16

involved. *See id.* § 4-1.1(a)(6) (discussing distribution via grandparents). As the Supreme Court has observed, it is for precisely this reason that, in states that do permit posthumously conceived children to inherit via intestacy, these rights are generally qualified by time limits not present in either Section 4-1.1 or 4-1.2. *See Capato*, 132 S. Ct. at 2031-32.[4]

In addition, though we recognize the hazards of using later-adopted law to construe the meaning of an earlier enacted provision, *see Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990), we note that new Section 4-1.3, enacted in 2014 after the final agency decision in this case, is, as one would expect given our analysis above, designed to provide a specific framework for inheritance by children conceived by assisted reproductive technology after the passing of their genetic parent.[5] Pursuant to this provision, a "genetic child,"

---

[4] As an aside, dicta in *Capato* align with our interpretation of Section 4-1.1(c). There, the Supreme Court recognized that "[i]ntestacy laws in a number of States . . . do provide for inheritance by posthumously conceived children." *Capato*, 132 S. Ct. at 2032. Then, using a "but see" signal in an accompanying footnote, the Court cited directly to Section 4-1.1(c), suggesting that this provision, read most naturally, does not grant such inheritance rights. *See id.* at 2032 n.9.

[5] Though MacNeil requests that we ask the New York Court of Appeals to resolve whether posthumously conceived children may inherit in intestacy and the SSA does not oppose certification, we see no reason to certify in this case. First, "certification is not proper" where "there is no split of authority [on a question] and sufficient precedents exist for us to make a determination." *Schoenefeld v. New York*, 748 F.3d 464, 470 n.5 (2d Cir. 2014) (internal quotation marks and notations omitted).

defined as a "child of the sperm or ova provided by a genetic parent," may inherit by intestacy "if and when such child is born," subject to certain conditions. EPTL § 4-1.3(a)(3). Among other things, for the child to inherit, the genetic parent must execute a written instrument "not more than seven years" prior to his or her death permitting the use of the genetic material for purposes of posthumous conception, and the child must be "in utero no later than twenty-four months after the genetic parent's death or born no later than thirty-three months after the genetic parent's death." *Id.* §§ 4-1.3(b)(1)(A), (b)(4). Moreover, recognizing the implications of Section 4-1.1(c) described above, Section 4-1.3(b) specifically provides that a "genetic child" is deemed issue of the genetic parent for purposes of inheritance law "notwithstanding paragraph (c) of [S]ection 4-1.1 of this part," language notably absent from Section 4-1.2(a)(2)(C), the provision for non-marital children on which MacNeil relies.

Finally, MacNeil fails to address the impact that her interpretation of Section 4-1.2 would have on the interpretation of other provisions of the EPTL. *See, e.g.,* EPTL §§ 2-1.3 (addressing dispositions to adopted and posthumous children as members of a class); 5-3.2 (concerning the effect of the birth of a child

Second, after the adoption of Section 4-1.3, the New York law governing future cases is clear, and thus we cannot say that the question is of sufficient importance to the state and state public policy choices to warrant certification. *See id.* at 470.

18

after the execution of a will); 5-4.5 (concerning the rights of family members resulting from wrongful acts causing the decedent's death). For example, Section 5-3.2(b) defines an "after-born child" as a "child of the testator born during the testator's lifetime or in gestation at the time of the testator's death." The provision goes on to state that, for purposes of the section, "a non-marital child . . . *shall be considered an after-born child* . . . where paternity is established pursuant to [S]ection 4-1.2." *Id.* § 5-3.2(b) (emphasis added). The most natural reading of this definitional provision (as with our interpretation of the interaction between Sections 4-1.1(c) and 4-1.2) is that a non-marital child is thus also included in the class of after-born children—who are children born "during the testator's lifetime or in gestation at the time of the testator's death"—so long as paternity can be established under the rules provided in Section 4.1-2.

But, under MacNeil's reading, Section 4-1.2 operates to permit a genetic child born long after his or her father's death to inherit. Under this view, the definition provided in Section 5-3.2(b) descends into logical impossibility: an "after-born child" is *both* a "child of the testator born during the testator's lifetime or in gestation at the time of the testator's death" *and* a child born long

19

after the testator has passed away.[6]    Thus, by ignoring the effect of her reading

on other statutory provisions incorporating Section 4-1.2, MacNeil muddies the

"clear and unambiguous" meaning of a section of the statute which, it bears

repeating, nowhere permits a posthumously conceived child to inherit.  *See*

*People v. Pabon*, 28 N.Y.3d 147, 152 (2016).

*    *    *

In *Capato*, the Supreme Court observed that the Social Security Act was

designed specifically to "provide dependent members of a wage earner's family

with protection against the hardship occasioned by the loss of the insured's

earnings"—a specific hardship to which those conceived after the death of the

wage earner, and thus never reliant on his support, are not subject.   132 S. Ct.

at 2032.   Citing the fact that "[i]ntestacy laws in a number of States . . . do

provide for inheritance by posthumously conceived children," the Court noted in

*Capato* that "the intestacy criterion yields benefits to some children outside the

Act's central concern."   *Id.*   The Court concluded, however, that "[i]t was . . .

Congress' prerogative to legislate for the generality of cases . . . by employing

---

[6] And if MacNeil would argue that Section 4-1.2 operates differently when incorporated into Section 5-3.2(b) than it does in the intestacy context, she fails to either provide any textual evidence in support of that proposition or answer the further question why, in the absence of statutory language indicating otherwise, Section 4-1.2 *should* operate differently in these two contexts.

eligibility to inherit under state intestacy law as a workable substitute for burdensome case-by-case determinations whether the child was, in fact dependent on her father's earnings."  *Id.*

Here, we conclude that New York's intestacy law, as it existed in 2013 at the time of the agency's final determination, did not permit children conceived posthumously to inherit via intestacy.  This determination, which requires the further conclusion that the MacNeil twins' applications for benefits were properly denied, is dispositive of the present appeal.  Having considered the remainder of MacNeil's arguments and finding them to be without merit, and for the foregoing reasons, we **AFFIRM** the judgment of the district court.

GERARD E. LYNCH, *concurring*:

I concur fully in Judge Livingston's thorough and detailed opinion, which accurately explains the law governing this case. As the panel opinion demonstrates, the denial of the MacNeil children's application for survivors' benefits follows inexorably from two clear legal rules: First, the Social Security Act defines eligible children by reference to state intestacy law. And second, New York intestacy law does not now, and never has, permitted intestate inheritance by children conceived long after the death of a parent. I write separately only to note some additional facts about the case, and to suggest that Congress may wish to take up the unique problem it poses.

First, the facts. The claimant children are the product of a combination of a moving romantic connection and modern reproductive technology. As the panel opinion describes, Sharon MacNeil married her college sweetheart not long after their graduation. Shortly thereafter, Eric MacNeil was diagnosed with a dangerous cancer. The couple were deeply committed to each other, however, and discussed their hopes for having children together. They determined to preserve Eric's sperm, against the possibility that his cancer treatment would either fail, or, if it succeeded in saving his life, render him infertile. When Eric learned that his death was inevitable, he gave his wife permission to use the preserved sperm if she decided to have his children after his death, and took what limited steps were in his power to provide some financial support to his wife and to any children of his that she might bear, including making them the

beneficiaries of a life insurance policy. Eric MacNeil died at twenty-four, barely a year and a half into his marriage.

Needless to say, in the wake of her young husband's death, dealing with her grief, struggling with limited financial resources, and enduring the loss of both of her parents in the next few years, for some time Sharon MacNeil felt unable to undergo the expensive and difficult process of *in vitro* fertilization or to raise children as a single parent. Instead, she returned to school, obtained an advanced degree, and went to work. But her desire to have children – her late husband's children – remained with her over years of struggle and saving. Eleven years after Eric's death, Sharon began the process of *in vitro* fertilization of her eggs with Eric's sperm and implantation of the resulting embryos. The procedure was successful: Sharon became pregnant, carried two babies to term, and gave birth to the twins whose claims are before the Court.

The MacNeils' story, though commenced in sadness,  is one of love, commitment, and determination. It is also a story of modern scientific accomplishment. Although the possibilities opened up by assisted reproductive technology are by now well established and even familiar, they would have been utterly unimaginable to the drafters of the Social Security Act in the depths of the Great Depression over 80 years ago.

Second, the suggestion. As noted, the Congress that adopted the Social Security Act, and thereby provided for benefits for orphaned children, had no intentions

whatever with respect to children *conceived* (as opposed to born) posthumously, because such conception was unimaginable at the time. In undertaking to define which children were eligible for benefits, a principal concern was drawing lines with respect to non-marital children: specifically, how could such children demonstrate their "dependence" on a deceased parent such that their entitlement to survivors' benefits could be established? It was eminently reasonable for Congress, concerned primarily with the larger outlines of the complex social security program, to defer this question to the law of the states, which had, and still have, primary responsibility for family law, and had already developed a set of "legitimacy" laws to answer that question in the inheritance context. And the choice to rely on state intestacy laws appears to have stood the test of time; there is little evidence of controversy, difficulties, or complex litigation deriving from that decision over the years.

The rise of scientifically-assisted reproduction technologies may, however, have opened a fissure between the policies of the Social Security Act and those of intestate succession in the small category of cases like the present one. As the panel opinion discusses, New York has recently changed its inheritance laws to confer succession rights on posthumously conceived children under limited circumstances, and in particular only when such children are born within a relatively short period after the death of the intestate parent. Imposing a strict time-limit is an eminently practical

3

decision in the inheritance context. As the Court notes, estates cannot be held open indefinitely (delaying distribution to existing heirs and incurring administrative expenses) against the possibility of the birth of additional heirs years in the future, nor is it practical to distribute an estate to existing heirs but reclaim the assets and unscramble the distributions through further litigation years later at the behest of after-born heirs. But those considerations are not relevant to the functioning of the Social Security Act.

The panel opinion notes another policy that may dovetail with those concerns, however. Citing the Supreme Court's opinion in *Astrue v. Capato*, 566 U.S. 541, 132 S.Ct. 2021 (2012), the panel suggests that Congress may have been concerned only with protecting "dependent members of a wage earner's family with protection against the hardship occasioned by the loss of the insured's earnings," *id.* at 2032 (internal brackets and quotation marks omitted), a hardship which the Court suggested is not experienced by "those conceived after the death of the wage earner, and thus never reliant on his support," Panel op. at 20, citing *id*.

That is perhaps a reasonable view. Certainly the original drafters of the Act were concerned about children who *did* enjoy a parent's financial support for some period of time (or, in the "pregnant widow" scenario, were at least conceived with that expectation), and then were deprived of that support by the parent's untimely death. But again, Congress had no occasion at the time to think of children in the situation of

4

the MacNeil twins.

It is perhaps unduly narrow, however, to consider that children such as the claimants here are somehow not financially burdened by the death of their biological father, simply because it occurred long before they were born. Surely, if Eric MacNeil had lived, his children would have benefitted from his earning power. And equally surely, the existing children are in a less secure financial position than they would be if their father were alive to contribute to their support. Indeed, it would be entirely reasonable for a person, anticipating that problem, to purchase insurance for the purpose of supporting his or her offspring in the event of premature death, whether or not he or she already had children or had yet developed a significant earning capacity. In the present case, Eric made the same effort: the record indicates that Eric told his wife to use the proceeds of his life insurance policy to support any children she conceived after his death. In the same spirit, it is not clear that social insurance should exclude the possibility of paying benefits on the basis of the insured's earnings record to children who are conceived after the insured's death.[1]

---

[1] Of course, the social security system is, in fact, a "trust fund financed, in large part, by taxes levied on the wage earners who are the primary beneficiaries of the fund," rather than a traditional form of insurance. *See Califano v. Jobst*, 434 U.S. 47, 52 (1977); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 595 (2012) (describing social security as a "tax-and-spend" program). Nevertheless, the program has long been pitched to voters as comparable to insurance insofar as it extends an entitlement to benefits to people who pay into the system. *See, e.g.*, *Califano v. Goldfarb*, 430 U.S. 199, 208 (1977) (plurality opinion) (describing the social security system as a "program of social insurance").

Of course, I am in no position to assess whether doing so would be good or bad policy. It is the role of Congress, and not of the courts, to study the situation, assess the costs and benefits of providing such coverage, and weigh the complexities of dealing with any program to provide for posthumously conceived children (how would such children be defined, independently of state intestate succession law? how would the biological children of married parents like Eric MacNeil be distinguished from the biological offspring of an insured donor to a sperm bank? would it matter if the children were born into a two-parent household and adopted by the surviving parent's spouse?). Perhaps it would be reasonable to leave the law unchanged, adhering to the advantage of a clear and simple rule that provides for the originally intended class of orphaned children, rather than to attempt to create a more complicated program for the relatively few (but increasing number of) children in the situation of the present claimants. I do not have any settled view about whether it wold be practical or desirable social or fiscal policy to provide a special rule for posthumously conceived children – and if I did, it would not be my role to promote it, and there would be little reason for Congress to attend to it.

But I do know that there is no evidence that Congress has ever considered or addressed the new possibilities created by assisted reproductive technology in this context, and I think it is a mistake to pretend that anything in the *original* intentions of

Congress in adopting the Social Security Act tells us what the long-deceased drafters of the Act would have thought about this case, or what a present or future Congress would conclude if it studied the question. Moreover, it is tolerably clear to me that this is an instance in which there are entirely sound reasons for states to utilize restrictive rules in the context of intestacy, which reasons diverge from the considerations relevant to the sound administration of the Social Security Act. It would therefore make sense, I think, for the Social Security Administration, and members of the relevant congressional committees and their staffs, to devote some thought to the issue.

In the present case, however, we can only apply the law as it was written, and under the law as written it is clear that Congress has not provided benefits for children in the category of the MacNeil twins.